**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ALEXIS OMAR ORTIZ CABRERA** | : | **No. 18-304-01** |

## MEMORANDUM

PRATTER, J.                                                                    FEBRUARY 4, 2021

Alexis Omar Ortiz Cabrera seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The bases for his motion are the prevalence of COVID-19 throughout the facility where he is currently incarcerated and that he has recovered from a bout of the virus. The Government opposes the motion, given that Mr. Ortiz Cabrera does not present any medical conditions that constitute an extraordinary and compelling reason to justify his release. For the following reasons, the Court denies the motion.

### BACKGROUND

### I.    Mr. Ortiz Cabrera's Criminal Conduct

Mr. Ortiz Cabrera pled guilty to conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846, possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and attempted possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 846.

In 2018, Mr. Ortiz Cabrera and a co-defendant were apprehended while preparing to process and package cocaine. Postal inspectors intercepted the cocaine, which was hidden in a compartment inside some furniture, when it was shipped through the United States mail. The inspectors prepared the cocaine for controlled delivery, including replacing it with a filler substance, a detection powder, a break wire, and a tracker. The reassembled furniture was then

1

sent through the mail to Mr. Ortiz Cabrera's father's house. When Mr. Ortiz Cabrera and his co-defendant opened the compartment, they tripped the break wire and spilled detection powder on their hands. Postal inspectors were alerted that the package had been opened and conducted a search of the house. During that search, they uncovered a second piece of furniture also containing cocaine in a similar compartment, a stolen firearm, and drug packaging materials, among other things.

At the time he pled guilty, Mr. Ortiz Cabrera did not have a criminal record. He was sentenced to a within-guidelines range of 60 months' imprisonment.

Mr. Ortiz Cabrera is currently serving his sentence at FCI Fort Dix. He has served approximately 22 months and he has received credit for completing a drug treatment program and nearly two months credit for good conduct. His anticipated release date is now July 18, 2022. He has not committed any disciplinary infractions during this time.

## II.     Mr. Ortiz Cabrera's Request for Compassionate Release and Medical Records

Mr. Ortiz Cabrera states that he submitted a letter request to his facility's warden for compassionate release on December 3, 2020. The warden responded on December 28 asking that Mr. Ortiz Cabrera resubmit his letter with reasons supporting a request for release. Doc. No. 82 at 10-11. In January 2021, Mr. Ortiz Cabrera filed this motion. He seeks relief based on his prior COVID-19 infection. The Government accepts that he has exhausted his request for administrative relief.

Mr. Ortiz Cabrera's medical records for the past year reveal that he is a 24-year-old with an opioid use disorder and anxiety but no other chronic health conditions. He tested positive for COVID-19 roughly three months ago. Although his two subsequent tests were negative, Mr. Ortiz Cabrera was placed into "exposure quarantine" where he was monitored. He was asymptomatic

2

and has since recovered. He does not present any ailments resulting from this prior infection. He is reportedly fully ambulatory and engages in all normal activities of daily living within the prison.

## III.     BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[1] and it has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.[2] The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions nine months ago, in March of last year.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering and social distancing has largely been suspended. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.

---

[1]      BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Feb. 4, 2021).

[2]      BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Feb. 4, 2021).

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

As to the current situation at Fort Dix FCI, the Court in no way minimizes the threat that COVID-19 poses. In November 2020, the facility experienced a large outbreak and almost all of

---

[3]     This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

its inmates were infected. Following that outbreak, 1,461 inmates and 45 staff members previously positive for COVID-19 have since recovered.[4]  As of February 4, 2021, the facility reports that 176 inmates and 35 staff members are currently COVID-positive.  All but one inmate, including Mr. Ortiz Cabrera, recovered from the November outbreak.  Thus far, Fort Dix has isolated any inmate who tests positive while they are treated and recovering.  And the BOP website continues to provide transparent information with the community about positive cases and recoveries.

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007).  However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[5] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement,[6] a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's

---

[4]     The data is current as of February 4, 2021, according to the BOP website, available at https://www.bop.gov/coronavirus.

[5]     "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'"  *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

[6]     The Government does not contest that Mr. Ortiz Cabrera has met the exhaustion requirement.

applicable policy statements,[7] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

The Court must also consider the sentencing factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

---

[7]     Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Neal*, No. 2:08-CR-00628-JMG-5, 2020 WL 5993290, at \*4 (E.D. Pa. Oct. 9, 2020); *United States v. Adeyemi*, 470 F. Supp. 3d 489, 512 (E.D. Pa. 2020).

## DISCUSSION

Mr. Ortiz Cabrera argues that he should be immediately released under 18 U.S.C. § 3582(c)(1)(A)(i) given that he has recovered from a previous bout of COVID-19. But compassionate release requires that Mr. Ortiz Cabrera present an extraordinary and compelling reason for his release. He does not do so here. So, the Court denies his motion.

In the context of the COVID-19 pandemic, courts have limited compassionate release to situations when the defendant suffers from a serious medical condition that increases his risk of severe consequences from the virus. The Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness or death.[8] This Court is not bound by the CDC's guidelines. But it, as well as many other district courts, have treated its guidance as reliably informative. *See United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at \*2 (E.D. Pa. Oct. 28, 2020) (listing cases). As demonstrated by his medical records, there is no evidence that Mr. Ortiz Cabrera, who is 24 years old, suffers from a condition that is considered "high-risk" by the CDC.

Mr. Ortiz Cabrera's generalized concern that he may contract the virus again is not an extraordinary and compelling reason to warrant release. Because COVID-19 poses a general threat to every non-immune individual, the mere existence of the disease does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The

---

[8]     *See People at Increased Risk*, Centers for Disease Control and Prevention (Jan. 4, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Feb. 4, 2021).

CDC acknowledges that, although there have been cases of re-infection reported, these remain rare.[9] To be sure, Mr. Ortiz Cabrera did test previously positive for COVID-19. But he was fortunate to be an asymptomatic case and he has made an apparent full recovery. A careful review of Mr. Ortiz Cabrera's medical records show that he received proper medical attention, including being placed in exposure quarantine immediately upon testing positive and receiving daily medical assessments. Doc. No. 85 (under seal).

Moreover, this Court is unable to find a case granting compassionate release to a defendant who recovered from COVID-19 and was asymptomatic. To the contrary, the consensus is that such a circumstance does not warrant release—even when the defendant has other documented medical conditions. *See, e.g.*, *United States v. Wiltshire*, No. CR 11-310, 2020 WL 7263184, at *6 (E.D. Pa. Dec. 9, 2020) (motion denied for defendant with hypertension who tested positive for COVID-19, was asymptomatic, and recovered); *United States v. Moore*, No. CR 14-315-06, 2020 WL 7264597, at *3 (E.D. Pa. Dec. 10, 2020) (release denied when defendant with hypertension, high cholesterol, GERD, and mild obesity recovered from asymptomatic bout of COVID-19); *United States v. Norcross*, No. 8:05-CR-291-T-02JSS, 2020 WL 5076578, at *2 (M.D. Fla. Aug. 27, 2020) (denying motion for release where defendant had hypertension and recovered from COVID-19); *United States v. Peuse*, No. 17-CR-00598-LHK, 2020 WL 5076356 (N.D. Cal. Aug. 24, 2020) (collecting cases).

Mr. Ortiz Cabrera's second ground for release—the risk that he may have lingering symptoms even after recovering from COVID-19—is too speculative to constitute an extraordinary and compelling reason. He questions whether Fort Dix can provide "proper aftercare

---

[9]     CDC, *Reinfection with COVID-19* (updated Oct. 27, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last visited Feb. 4, 2021).

and follow-up testing" for those who have recovered from the virus. The CDC recognizes that most people recover from COVID-19 and return to normal health, but some continue to experience long-term effects of the virus.[10]

Although Mr. Ortiz Cabrera lists the myriad long-term symptoms that have affected some people, he does not claim to be exhibiting any of them at present. And his medical records do not document any of these symptoms either. The Court does not minimize the critical health risk posed by COVID-19. And the Court is not unmindful that the long-term effects of the virus are yet unknown. But Mr. Ortiz Cabrera must show something beyond a theoretical concern that he may develop "significant aftereffects" particularly when he has recovered from an asymptomatic bout of the virus and otherwise has no medical conditions. He has not done so here. Moreover, release from prison at this point seems unresponsive to the possibility of "after effects" of a condition already experienced.

Although it is his burden to show that a reduction in sentence in proper, Mr. Ortiz Cabrera has failed to make any showing that an early release aligns with the statutory sentencing factors, notably the seriousness of his offense, the need to promote respect for the law, the need to provide just punishment for the offense, and the need to deter others from similar criminality. *See* 18 U.S.C. § 3553(a). Indeed, Mr. Ortiz Cabrera does not discuss the sentencing factors in his motion.

Nevertheless, the Third Circuit Court of Appeals holds that a court reviewing a motion for compassionate release must nevertheless consider the § 3553(a) factors to the extent they are applicable. *United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020). A reduction in sentence is not appropriate here given the need for adequate deterrence and to protect the public from future crimes. Mr. Ortiz Cabrera's underlying crime—possession of cocaine with intent to distribute—

---

[10]     CDC, *Long-Term Effects of COVID-19* (updated Nov. 13, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html (last visited Feb. 4, 2021).

9

is serious. In sentencing Mr. Ortiz Cabrera to a term within the Federal Sentencing Guidelines, the Court considered that he is a first-time offender. And, it is not unmindful that he has served much of his sentence, during which time he has not earned any disciplinary infractions. Nonetheless, the Court declines to release Mr. Ortiz Cabrera when he does not present any extraordinary and compelling reason that would warrant a sentence reduction.

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Ortiz Cabrera's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE